IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DE LAGE LANDEN FINANCIAL SERVICES, INC. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| MIRAMAX FILM CORP. | : | NO. 06-2319 |

MEMORANDUM AND ORDER

McLaughlin, J.                                          September 23, 2008

        This case involves a dispute about the rental of copy
machines by Miramax Film Corp. ("Miramax").  De Lage Landen
Financial Services, Inc. ("DLL"), a financial services company,
initially sued Miramax to recover on an alleged contract among
it, MWB Copy Products, Inc. ("MWB"), a lessor of copy machines,
and Miramax.  Miramax defended against DLL's claim by contending
that it did not assent to the contract on which DLL sued and
brought a third-party complaint against MWB for fraud, alleging
that MWB perpetrated a fraud on Miramax when its Vice President
of Sales, Robert Kaminsky, falsified contract documents it sent
to DLL.  DLL then brought claims against MWB for fraud, breach of
contract, and breach of warranty.

        The Court held a bench trial on December 10-11, 2007.
This memorandum comprises the Court's findings of fact and
conclusions of law.  The Court finds for Miramax on DLL's claims
against Miramax and on Miramax's claims against MWB.  The Court

finds for DLL on its claims for breach of contract and breach of warranty against MWB and for MWB on DLL's fraud claim.


I.   Findings of Fact

     A.   Parties

          1.   Miramax is an indirect subsidiary of The Walt Disney Corporation with a principal place of business at 161 Avenue of the Americas, New York, New York.  Between 2000 and 2005, Miramax maintained offices in Los Angeles, California, and New York City.

          2.   DLL is a Michigan corporation with its principal place of business at 1111 Old Eagle School Road, Wayne, Pennsylvania.

          3.   DLL is a financial services company that provides financial products to vendors.  One such product is the leasing of office equipment through dealers.  These dealers originate transactions for the sale of equipment.  A dealer will prepare the documents for any given transaction and send them to DLL for DLL to consider funding the transaction.  Once DLL approves the credit transaction, DLL then sends the credit approval to the dealer, who will negotiate and prepare documents with the end users.  The dealer then sends the documents to DLL for funding. DLL reviews the transaction for accuracy, performs an audit, and funds the dealer.  DLL then commences invoicing to the end user.

4.    MWB is a California corporation with its principal place of business at 5700 Warland Drive, Cypress, California.  A large component of MWB's business is the sale and lease of copiers and printers in various local markets.

5.    MWB has relationships with a number of third-party lessors who provide the financing for the copiers it offers.  The third-party lessors with whom MWB works include DLL.

6.    In most cases, MWB solicits and negotiates directly with the end user and then seeks financing from third-party lessors, such as DLL.  DLL and MWB carried out their business relationship in the manner described in paragraph 3 above.

7.    With MWB, DLL used an arrangement known as a "private label agreement."  Under the private label agreement, the lease documents and subsequent invoices listed the leasing company name as "MWB Business Systems" rather than DLL.

B.    <u>Robert Kaminsky</u>

8.    Robert Kaminsky served as MWB's Vice President of Sales from November 2003 through June 2005.  As Vice President of Sales, Kaminsky reported directly to the President of MWB and was "responsible for overall sales performance and all functions as it relates to the Sales Department."

9.  MWB's job description for Vice President of Sales includes no limitation on his authority in that position.

10.  MWB terminated Kaminsky on June 2, 2005.

11.  In December 2004, prior to Kaminsky's termination, MWB executives emailed Kaminsky to inquire about a customer that appeared to feel that it had a 36-month lease instead of a 60-month lease.

12.  After MWB terminated Kaminsky, DLL learned that Kaminsky was involved in a separate transaction in which DLL funded a lease for an end user in Florida, and that there were irregularities concerning the lease documents in that transaction.  In addition, after MWB terminated Kaminsky, MWB further learned that Kaminsky had converted MWB funds by endorsing and depositing into his personal account checks from MWB customers made out to MWB totaling approximately $35,000.

C.  The 2000 Agreement

13.  On or about October 25, 2000, Miramax entered into a rental agreement with MWB and DLL under which Miramax obtained document reproduction machines from MWB (the "2000 Agreement"). The 2000 Agreement covered a total of four machines--three new machines and four used machines--and was for a term of sixty months, expiring on December 31, 2005.  Under the 2000 Agreement, Miramax was charged on a cost-per-image basis, with a minimum

4

monthly payment of $12,820.50.  The Agreement went into effect on January 1, 2001, and was scheduled to end on December 21, 2005.

14.  After the 2000 Agreement went into effect, Miramax received invoices from an entity called MWB Business Systems. Miramax did not know, and was never informed, that MWB Business Systems was a name used by DLL for the purpose of servicing payments under agreements DLL had financed.  Miramax made payments to MWB Business Systems throughout the term of the 2000 Agreement.

15.  Following the execution of the 2000 Agreement, Miramax, MWB, and DLL entered into four separate addenda to the 2000 Agreement.  These addenda were executed by Miramax on May 9, 2001, October 22, 2001, September 17, 2002, and June 23, 2003, respectively.  Through each of these addenda, one or more machines were added to the 2000 Agreement.  After the final addendum went into effect, Miramax's minimum monthly payment was approximately $21,480.30.


    D.   <u>The 2004 Agreement</u>

16.  Jennifer Conine was Director of Facilities for Miramax from June 2003 until September 2006.  One of her duties was to oversee the copier contracts.

17.  When Conine took over, she reviewed the equipment contracts with Miramax's vendors.  Miramax had a national

5

agreement through Disney with Canon under which the price per copier was approximately $500. The cost with MWB, on the other hand, was approximately $23,000 for eight copy machines. She thus concluded that the pricing with MWB was too high.

18.  Conine met with all of the vendors during her first year at Miramax, either in person or by telephone. In early 2004, she reached out to Kaminsky to discuss all aspects of the MWB equipment rental. She met with him in person. He told her that he represented MWB and that he was Vice President of Sales for the company.

19.  When Conine expressed her concern about the price of the machines to Kaminsky, he offered to reduce the price on the monthly invoice they were paying. He told her that he wanted to keep Miramax's business.

20.  Conine thought that the leasing company--"MWB Business Systems"--was part of MWB. She was never told that the leasing company was actually a different company from MWB. Kaminsky referred to it as the "leasing division." Thus, when Kaminsky ended up telling Conine to make changes to their contract, Conine believed that he was speaking for the leasing company.

21.  Neither MWB nor DLL ever communicated to Miramax any limitations on Kaminsky's authority.

6

22.   In his dealings with Miramax, Kaminsky identified himself as the Vice President of Sales of MWB.

23.   Through his actions, Kaminsky left Miramax with the impression that he was negotiating with Miramax on behalf of MWB and DLL.

24.   Although Miramax was aware of the existence of a leasing company that was involved in its copier leases, it believed that Kaminsky had the authority to negotiate on behalf of any leasing company.

25.   MWB was the only entity with which Jennifer Conine, Miramax's Director of Facilities, dealt in negotiating the copier agreements here at issue.

26.   Conine did not have an understanding of MWB's relationship with DLL or its role in any transactions with Miramax.

27.   Prior to the summer of 2005, DLL had no contact with Conine or anyone else at Miramax.

28.   After Conine complained to Kaminsky about the cost of the copiers, Kaminsky furnished to Miramax a draft of a new rental agreement to replace the 2000 Agreement.

29.   From the outset of the parties' discussions, Conine informed Kaminsky that Miramax would not enter into any renegotiated agreement with MWB unless the renegotiated agreement

had the same December 31, 2005, expiration date as the 2000 Rental Agreement.

30.   Specifically, on May 28, 2004, when Kaminsky proposed the signing of a new lease, Conine responded in an email to Kaminsky, "I do not want to extend any leases."

31.   At some time prior to June 17, 2004, Kaminsky forwarded a draft contract to Conine for a new 60-month term.

32.   On June 17, 2004, after reviewing Kaminsky's proposed draft agreement, Conine emailed Kaminsky and told him, "The contract you sent me is for 60 months.  I am not signing a new contract for anything that goes past . . . 2005."  In the same email exchange, Kaminsky agreed that any new agreement would coincide with the original 2005 expiration date, to which Conine responded, "The contract needs to reflect that."

33.   Similarly, on August 9, 2004, Conine reminded Kaminsky, "As I mentioned to you, I do not want to start a new lease term."

34.   On August 25, 2004, Conine specifically requested that Kaminsky provide a written proposal, preferably in the form of a spreadsheet, setting forth the numbers related to Miramax's current contract and what was being proposed.

35.   Kaminsky responded the next day with a written proposal via email, wherein he assured Conine that "this lease

8

supercedes the old one and only runs thru the original expiration date."

36.   On September 9, 2004, Kaminsky followed up on this proposal with a draft of an addendum to the new rental agreement, which provided that the new rental agreement would expire in 2005.  His cover email again promised that the new rental agreement would have the same expiration date as the 2000 Agreement.

37.   On September 17, 2004, Conine and Kaminsky exchanged emails concerning the possibility of making a change to the proposed rental agreement.  In this exchange, Conine asked Kaminsky to "find out from the leasing dept if the change can be made on the contract first."  When Conine suggested that she would like to write the change directly on the rental agreement, Kaminsky responded in writing, "I agree."  Conine then asked, "Does the lease company approve this?"

38.   In response, also on September 17, 2004, Kaminsky specifically instructed Conine, via email, that she should proceed and write in the following at the bottom of the new rental agreement:

> This lease supercedes original contract #24368657, start date 11/29/2000 - expiration is 12/31/05. This contract will expire on 12/31/05 as did the original contract.

39.   On or about September 21, 2004, MWB forwarded to Conine a final version of the new rental agreement and an

addendum to the new rental agreement for execution by Miramax. Pursuant to MWB's instructions, Conine hand-wrote the following on the new rental agreement:

> This lease supercedes original contract #24268657, start date 11/29/2000 (expires 12/31/05).  This lease will also expire on 12/31/05 as did the original contract.

40.  On or about September 22, 2004, Miramax, through its Chief Financial Officer, Ross Landsbaum, accepted and executed the 2004 Rental Agreement and accompanying Addendum.

41.  On September 22, 2004, Miramax faxed to MWB the executed 2004 Rental Agreement and Addendum.

42.  Under the 2004 Rental Agreement, Miramax agreed to pay a base monthly rental of $17,650 through December 2005.

43.  The 2004 Rental Agreement provided, "This Agreement goes into effect on the day YOU [Miramax] sign the Delivery and Acceptance Form ('Effective Date')."  MWB delivered and Miramax accepted six machines on September 30, 2004.  The remainder of the machines were delivered in January 2005.

    E.    The 2005 Agreement

44.  In early December 2004, MWB, through Kaminsky, contacted Miramax and stated that MWB wished to enter into two new agreements to replace the 2004 Agreement.

45.  On or about December 23, 2004, Kaminsky wrote to Conine and to Ross Landsbaum, Miramax's CEO, that the two

proposed agreements would be the equivalent of the 2004 Rental Agreement, with the same terms and conditions.  Kaminsky explained that MWB and DLL required separate agreements to replace the 2004 Rental Agreement for bookkeeping purposes.

46.  On December 28, 2004, Kaminsky requested, via email, that Landsbaum confirm that Miramax intended to sign the new agreements.  In response, Landsbaum wrote, "Assuming that the new documents are consistent with our prior agreement, I am not aware of any reason why we would not be able to accommodate you."

47.  On January 10, 2005, Kaminsky, in an email to Conine, wrote:

> both agreements are being signed (totaling apx
> 18,000.00 per month as agreed) but they will be
> only for the original term with the 14 months left
> and the addendum pertains to both.

Conine responded by writing "What do you mean by both agreements?" Kaminsky replied, "I'll call u to explain, there is one for the new equipment and the other was the old payoff of the old deal which both expire at end of term as per our new deal."

48.  At some point prior to Miramax executing the two new agreements, Conine underscored to Kaminsky that Miramax was not "going to be making 60 additional payments on the lease."

49.  On or about January 19, 2005, Kaminsky again instructed Miramax that it should make handwritten additions to the agreements.

11

50.   On or about January 20, 2005, Kaminsky, on behalf of MWB and DLL, furnished a draft of the payment agreement to Miramax (the "Draft Payment Agreement").   Section 1 of the Draft Payment Agreement included a number of payment options, one of which was to be selected.

51.   Option 5 of the Draft Payment Agreement called for 60 monthly payments in the amount of $5,819.86.

52.   Upon furnishing the Draft Payment Agreement to Miramax, on January 20, 2005, Kaminsky specifically instructed Miramax in writing that Miramax should insert "12 months" in option 5, and initial that insertion.   Miramax complied with this instruction.

53.   On or about January 20, 2005, Miramax accepted and executed the final version of the payment agreement (the "Final Payment Agreement"), which it had filled in and initialed as Kaminsky had instructed.

54.   On or about January 20, 2005, Conine, pursuant to Kaminsky's instructions, hand-wrote the expiration term on the draft rental agreement that Kaminsky provided.

55.   On or about January 20, 2005, Miramax accepted and executed the final version of the new rental agreement (the "2005 Rental Agreement").   This agreement incorporated the term handwritten by Conine, per MWB's instructions, which read:

> 21.  THIS LEASE SUPERCEDES ORIGINAL
> CONTRACT #24368657 START DATE 11/29/00
> (EXPIRES 12/31/05) AND SUPPLEMENTAL
> CONTRACT SIGNED ON 9/22/04.  THIS LEASE
> WILL ALSO EXPIRE ON 12/31/05, AS DID THE
> ORIGINAL LEASE.

56.  Upon execution, the Final Payment Agreement was delivered to and received by MWB.

57.  Upon execution, the Final Rental Agreement was delivered to and received by MWB.

58.  The 2005 Rental Agreement called for monthly payments in the amount of $11,830.14.

59.  Under the Final Payment Agreement and the 2005 Rental Agreement, Miramax was to make total monthly payments of $17,650.  This combined amount is identical to the amount of each monthly payment Miramax owed under the 2004 Rental Agreement.

60.  If neither the 2004 Rental Agreement nor the 2005 Rental Agreement and Payment Agreement had existed, and Miramax had made payments based on the 2000 Agreement and related addenda (at the rate of $21,480.30 per month), in the final year of the 2000 Agreement, Miramax would have made 12 monthly payments of approximately $21,480.30 each, for a total of approximately $257,763.  During that final year, Miramax made monthly payments to DLL ranging between $18,326 and $19,122, for a total of $221,820 for the period.  Thus, the new agreements represented a discount of approximately $36,000 over the final year--a discount of approximately 14%.

61.   In late January 2005, MWB delivered the remainder of the new machines to Miramax.  The 2005 Rental Agreement contained the same provisions regarding the effective date of the agreement as the 2004 Rental Agreement.

62.   Following the delivery of all the new machines, MWB continued to provide service to Miramax when requested.

63.   Following Miramax's execution and delivery of the Final Rental Agreement and Final Payment Agreement, Conine made six written requests to Kaminsky for copies of fully executed versions of these agreements.  Neither Conine nor anyone else at Miramax received any documents in response to these requests.

F.   Termination of 2005 Agreement

64.   On August 1, 2005, Michael Stamolis of MWB informed Conine via email that Kaminsky was no longer employed at MWB.  On August 2, 2005, Conine responded with another request for copies of the fully executed agreement.

65.   On August 2, 2005, Stamolis emailed to Conine a version of the rental agreement.  This document, however, differed from the version of the document executed by Miramax.

66.   The version of the rental agreement Conine received from Stamolis did not include the handwritten changes Conine had made to the document pursuant to Kaminsky's instructions.  Specifically, this version of the rental agreement

14

did not include the additional term stating that this agreement
expired on December 31, 2005.  Instead, the portion of the
payment agreement wherein Conine had included the handwritten
terms appeared to have been whited out, and the initials "R.L."
had been written in.  Ross Landsbaum testified, and the Court
accepts, that those initials were not placed there by him.

67.  On September 16, 2005, Dee Berlanga of MWB emailed
to Conine a version of the payment agreement executed by MWB
and/or DLL representatives.  This document was also different
from the version that had been executed by Miramax.

68.  The version of the payment agreement received by
Conine from Berlanga did not include the handwritten changes
Conine had made to the document pursuant to Kaminsky's
instructions.  Instead, this version of the payment agreement
contained an entirely different second page that contained a
typewritten "x" rather than initials and called for Miramax to
make sixty payments of $5,819.86, rather than the twelve payments
to which Kaminsky had agreed.

69.  The versions of the payment and rental agreements
received by Conine from Berlanga are the same versions upon which
DLL bases its claims against Miramax.

70.  Kaminsky committed fraud on both Miramax and DLL
in connection with the 2005 Agreement.  Kaminsky did not send

copies or originals of the documents Miramax signed to DLL.
Kaminsky falsified the documents sent to DLL.

71.   Berlanga's email of September 16, 2005, also
included a copy of an unsigned letter from Bill O'Donnell of DLL
to Ross Landsbaum, dated February 22, 2005, purporting to confirm
the 60-month arrangement.  Neither DLL or MWB has proven by a
preponderance of the evidence that this letter was ever actually
sent to or received by Landsbaum, Conine, or anyone else at
Miramax at any point prior to Berlanga's September 16, 2005,
email.

72.   During the discovery phase of this litigation, DLL
produced another document purporting to be a letter confirming
that the new agreement with Miramax was for a new 60-month term.
The document purported to contain Landsbaum's signature.

73.   The letter DLL produced is not an original.
Instead, the letter is a scanned image appearing on an email
string that does not include Landsbaum at any point.  No original
of the document or letter has ever been found in or produced from
of DLL's, MWB's, or Miramax's files.

74.   Landsbaum testified that although he agreed that
the image appearing on the purported letter resembled his
signature, he doubted that he signed the letter.  Specifically,
when questioned about the letter, Landsbaum testified:

> I guess what I would say is that given that it's
> inconsistent with what our lawyer would have had

> in his files or Jen [Conine] would have had in
> the files, I find it highly unlikely that I would
> have signed it.

The Court concludes that neither DLL nor MWB proved by a preponderance of the evidence that Landsbaum signed this letter.

75.  Beginning with the invoice dated December 7, 2004, in accordance with the terms of the 2004 Agreement, Miramax began making payments to MWB Business Systems at the reduced monthly rate of $19,122.67.

76.  Beginning in March 2005, in accordance with the terms of the Final Payment Agreement and the Final Rental Agreement, Miramax began making monthly payments to MWB Business Systems in the amount of $12,865.97 and monthly payments to DLL in the amount of $5,770.48.

77.  As of November 2005, Miramax was current on all of its payments to MWB Business Systems and to DLL.

78.  On September 26, 2005, in accordance with the Final Rental Agreement, Conine notified MWB via email that Miramax would not be renewing the Final Rental Agreement past December 31, 2005.

79.  On September 27, 2005, Stamolis replied to Conine's email, requesting that the termination be sent on Miramax letterhead and either stamped or faxed.

80.  On September 28, 2005, Conine complied with Stamolis's request and faxed a termination letter to him.

17

81.   In December 2005, Conine made numerous requests to MWB via email that MWB pick up the copiers from Miramax.  Miramax never received any instructions from MWB or DLL concerning the retrieval of the copiers.  Miramax has since placed the machines into storage and has paid all storage fees to date.

G.   Agreements Between DLL and MWB

82.   On September 5, 2000, DLL entered into a Master Contracting Financing Program Agreement with Imagine Technology Group, Inc. (the "2000 Program Agreement").

83.   Pursuant to the 2000 Program Agreement, Imagine Technology, through wholly-owned subsidiaries, also called "dealers," would negotiate equipment leases with end users.  One such dealer under the 2000 Program Agreement was MWB.

84.   Section 9.1 of the Program Agreement specifically provides that DLL, Imagine Technology, and the dealers are separate entities, and that "[n]either DLL, Imagine Technology or the Dealers have acted, act, or shall be deemed to have acted or act, as an agent for the others."

85.   Each dealer who executed an Acknowledgment of the Program Agreement agreed to be bound by the Program Agreement's terms and conditions, and also made various further representations and warranties to DLL.

86.   MWB executed such an Acknowledgment.

18

87.   The warranties made by the acknowledging dealers included a promise by each dealer to deliver to DLL originals of the various contracts entered into with end users on DLL's behalf, including all equipment leases and rental agreements.

88.   Further included in these warranties was a promise that, to the best of each dealer's knowledge, all contracts and related documents delivered to DLL would be duly authorized, executed, and delivered.

89.   Moreover, each dealer promised that there would be no other agreements between the dealer and the end user that would modify, amend, or waive any terms or conditions.  Any refinancing or changes to the terms for repayment of existing contracts required DLL's approval.  Although permitted, changes made to pre-printed documents used by the dealers and end users to execute rental and payment agreements must also be approved by DLL.

90.   DLL would not have approved the changes made in the new payment agreement entered into with Miramax by Kaminsky because DLL generally will not refinance existing contracts unless there is a need for new equipment or a specific need for refinancing.

91.   In the 2000 Program Agreement, each dealer also promised that neither the dealer nor its agents would commit fraud or engage in any fraudulent activity or take any action to

19

cause the various contracts to become "invalid, cancelable, or enforceable."

92.   Under Section Seven of the Program Agreement, the dealers and Imagine Technology further agreed to indemnify DLL for losses, claims, liabilities, demands, and expenses in the event of any breach of warranty.   Under Section Six of the Program Agreement, they also agreed that if any contract were to become in default as a result of a breach of the Program Agreement by Imagine Technology or by a dealer, Imagine Technology or the breaching dealer would cure the breach within sixty days.   Section Six further lays out the specific damages due in such situations, which do not include attorneys' fees.

93.   On September 7, 2004, DLL received a letter from Global Imaging Systems, Inc. ("Global"), Imagine Technology's successor corporation.

94.   This letter stated, "[Global], as successor to [Imagine Technology], will not renew, and by this letter hereby terminates, effective September 7, 2004," Global's obligations under the 2000 Program Agreement and any amendments thereto.

95.   Global's letter did not terminate, or purport to terminate, the obligations of any of the dealers under the Program Agreement.

96.   Subsequent to Global's letter DLL continued to underwrite applications from MWB and the operating subsidiaries,

and continued to book and fund according to the provisions of the 2000 Program Agreement.

97.   In continuing to do business with MWB, DLL paid invoice costs, broker fees, and acquisition fees pursuant to the 2000 Program Agreement.  The pricing for deals after September 7, 2004 continued to be governed by the pricing in the 2000 Program Agreement.

II.  Conclusions of Law[1]

The Court will address the disputes between DLL and Miramax, then Miramax and MWB, and finally DLL and MWB.  Except as otherwise noted, the parties agree that Pennsylvania law governs these issues.

A.   DLL Versus Miramax

DLL brings two claims against Miramax.  First, DLL seeks rental payments under its own versions of the 2004 and 2005 Payment and Rental Agreements.  Second, it contends that Miramax is liable to it for having retained the copiers past the expiration of its lease.  Both of these claims fail.

---

[1] Reference to the above Findings of Fact shall be abbreviated "FOF."

1.   <u>Rental Payments Due to DLL</u>

The first count of DLL's second amended complaint alleges that Miramax is bound by DLL's versions of the Payment Agreement and Rental Agreement dated 2004 and 2005, and that Miramax has violated the terms of those agreements.  As a result, DLL seeks to hold Miramax liable for the monthly payments due as part of the 60-month term of those agreements.

This claim fails.  To establish breach of contract under Pennsylvania law, a party must show (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages.  <u>Ruthrauff, Inc. v. Ravin, Inc.</u>, 914 A.2d 880, 888 (Pa. Super. Ct. 2006). For a contract to be valid and binding, the parties must manifest mutual assent--that is, a meeting of the minds on the contract's essential terms.  <u>Brisbin v. Superior Valve Co.</u>, 398 F.3d 279, 293 (3d Cir. 2005) (citing <u>Yellow Run Coal Co. v. Alma-Elly-Yv Mines, Ltd.</u>, 426 A.2d 1152, 1154 (Pa. Super. Ct. 1981)).

As the Court has found, Miramax did not execute or otherwise assent to the versions of the agreements that DLL proffered at trial.  Therefore, no contracts on those terms were ever formed, and Miramax cannot be liable under them.  Moreover, in its post-trial memorandum, DLL all but abandons its claim that the 2004 and 2005 Agreements with the 60-month terms should be enforced directly against Miramax.  Instead, it devotes most of

its space to arguing that MWB is liable to DLL for essentially
the value of the contract, plus attorneys' fees, pursuant to
their Program Agreement.  The Court will take up this claim
below.

　　　　DLL argues that even if Miramax did not initially agree
to DLL's version of the contracts, Miramax ratified that version
in February 2005 when a confirmation was allegedly signed by
Miramax CFO Landsbaum, or in August or September 2005, when
Conine received copies of DLL's versions of the Rental Agreement
and Payment Agreement, and failed to complain.

　　　　This argument fails as well.  First, the cases that DLL
cites in support of this proposition are inapposite because they
concern situations in which a contract actually exists but one
party argues that there was fraud in the inducement.  DLL Br. in
Opp'n to Mot. for Summ. J. 11 (citing Associated Hardware Supply
Co. v. Big Wheel Distrib. Co., 355 F.2d 114, 120-21 (3d Cir.
1965); Retail Brand Alliance, Inc. v. Rockvale Outlet Ctr., LP,
No. 06-1857, 2007 WL 403885, at *6 (E.D. Pa. Jan. 31, 2007)).
Here, in contrast, there was never any contract between DLL and
Miramax on DLL's terms because there was no meeting of the minds
on the contract's essential terms.  It is not the case that
Kaminsky tricked Miramax into signing a document that did not say
what Miramax thought or expected it to say.  Rather, Kaminsky
provided one purported contract to Miramax and a materially

23

different one to DLL.  Miramax was not fraudulently induced to accept DLL's terms.  Rather, it never accepted, or even knew about, DLL's terms.  The concept of subsequently ratifying a voidable contract that was initially based on fraud is therefore inapplicable.

Second, even if the concept of ratification were appropriate in this case, Miramax never manifested assent to DLL's terms.  DLL has not proven by a preponderance of the evidence that Landsbaum read, let alone signed, the February 2005 letter.  FOF ¶ 71.  Furthermore, Conine acted reasonably in not immediately reading the entire copies of the agreements that she received in August and September 2005.  Based on the information and instructions she had received from Kaminsky, whom she believed to be the agent of MWB and DLL, she had no reason to believe that these copies contained terms that were any different from those she had received from Kaminsky months earlier.  FOF ¶¶ 46-54.

### 2.   Miramax's Liability For Keeping and Using the Copiers

DLL argues that Miramax is liable to it for the value of the use that Miramax admits it made of the copiers after it stopped making rental payments in December 2005.  Plaintiff's Exhibit 8, which contains DLL's calculation of damages against

Miramax, includes language that Miramax argues amounts to an attempt to raise a quantum meruit claim.

There is no quantum meruit claim in this case.  In its post-trial memorandum, DLL argues only that Miramax is liable for breach of the 2005 Rental Agreement for using the copy machines after it stopped making rental payments.  Because Miramax never agreed to DLL's version of the 2005 Rental Agreement, Miramax is not liable to DLL on that contract for its continued possession or use of the copiers.  Because DLL has not properly raised a quantum meruit claim, there is no basis for DLL to recover from Miramax for such continued possession or use.

Moreover, even had such a claim been raised properly, Miramax repeatedly requested that DLL remove the machines, and it used the machines only because DLL failed to remove them and Miramax could not fit any other machines into the space.  It is therefore far from certain that a quantum meruit claim would succeed, given that Miramax did not wrongfully withhold the copiers and indeed only reluctantly retained the copiers and paid for their storage during the pendency of this case.  FOF ¶ 81; Miramax Post-Trial Br. 17-18.

B.  <u>Miramax Versus DLL and MWB</u>

As third-party plaintiff, Miramax brings claims against both DLL and MWB.  First, it seeks a declaratory judgment that

its versions of the Payment and Rental Agreements are binding on the parties.  Second, it brings a claim for damages based on the fraud committed by Kaminsky, as MWB's agent.  The Court finds for Miramax on both of these claims.

### 1.  Declaratory Judgment that Miramax's Versions of the Agreements Are Binding on DLL and MWB

Miramax claims that both MWB and DLL are bound by the versions of the contracts negotiated by Kaminsky.  The Court agrees.  Kaminsky had inherent authority to bind MWB to the agreements he negotiated with Miramax.  As to DLL, the Court disagrees with Miramax's contention that Kaminsky had actual authority to act on behalf of DLL.  However, the Court finds that Kaminsky had apparent authority to bind DLL.

By virtue of his position as MWB's Vice President of Sales, Kaminsky had inherent authority to bind MWB with respect to a third party unless that third party had notice that Kaminsky's actions exceeded his authority.  Ortiz v. Duff-Norton Co., 975 F. Supp. 713, 720 (E.D. Pa. 1997) (citing Restatement (Second) of Agency § 9).  A general agent for a disclosed principal has inherent authority to take actions that "normally accompany his position simply by virtue of being given the position by the principal."  Id.  This determination does not rest on whether the principal actually authorized the agent's actions, but whether the agent's acts are those that "usually

26

accompany or are incidental to transactions which the agent is authorized to conduct" as long as "the other party reasonably believes that the agent is authorized to do them and has no notice that he is not so authorized." Id. (citing Restatement (Second) of Agency § 161).  Kaminsky was MWB's general agent for the purpose of negotiating sales contracts with those customers for whom he was the sales contact.  MWB is therefore bound by his actions.

MWB argues that it is not bound by Kaminsky's actions because Miramax should have known that his actions exceeded the scope of his authority to act on MWB's behalf.  Specifically, MWB argues that Miramax had "reason to know" of a limitation on Kaminsky's authority "because of information made available to [it]."  Ortiz, 975 F. Supp. at 720 (citing Restatement (Second) of Agency § 9).

This argument is meritless.  Miramax acted reasonably in believing that Kaminsky, as Vice President for Sales, had authority to enter into the contract with Miramax.  Miramax justifiably believed that a salesperson was authorized to give its customer a good deal in order to preserve its business relationship, as Kaminsky claimed he was doing.  FOF ¶ 19.

MWB's arguments that Miramax was sophisticated and that it already mistrusted Kaminsky and was taking precautions in dealing with him are to no avail.  Miramax took reasonable

27

precautions under the circumstances, including its insistence that any changes to the terms of the contract be written on the face of the contract, and not in an addendum.  FOF ¶ 37.  Miramax should not bear the risk that Kaminsky, its only contact at MWB, one of its vendors, proposed terms to Miramax that were materially different from the terms he conveyed to the entities on his side of the transaction.  Kaminsky's principal, MWB, is therefore bound by the version of the agreements that Kaminsky provided to Miramax and that Miramax signed.[2]

As to Kaminsky's authority to bind DLL contractually, Miramax argues that Kaminsky had actual authority to do so.  This argument is incorrect.  Actual authority consists of both the express authority that the principal has directly granted to the agent, and the implied authority to do those things that are necessary, proper, and usual in the exercise of the agent's express authority.  <u>Residential Reroofers Local 30-B Health & Welfare Fund v. A & B Metal & Roofing, Inc.</u>, 976 F. Supp. 341, 345 (E.D. Pa. 1997); <u>Bolus v. United Penn Bank</u>, 555 A.2d 1215, 1221 (Pa. Super. Ct. 1987).  Here, any trade-up deal for new equipment that involved refinancing an existing lease required DLL's prior approval.  Additionally, handwritten changes to a pre-printed form were permissible, but only with DLL's prior

---

[2]     Because the Court holds that Kaminsky had inherent authority to bind MWB, it will not address Miramax's argument that he also had both actual and apparent authority to bind MWB.

approval.  FOF ¶ 89.  DLL's witness testified credibly that DLL
would not have approved the refinancing if the new deal proposed
to it had not involved an extension of the previous lease term.
FOF ¶ 90.  Kaminsky did not obtain DLL's approval for the
handwritten changes stating that the new contract would terminate
on the same date as the previous contract.  Although Kaminsky had
actual authority to conduct negotiations, DLL explicitly required
him to obtain prior approval before committing to certain
provisions.  Kaminsky thus did not have actual authority--express
or implied--to make handwritten changes to pre-printed forms on
DLL's behalf, nor to approve a refinancing deal that did not
involve an extension of the existing lease term.

        Kaminsky did, however, have apparent authority to bind
DLL to the terms of the contract he proposed to Miramax.  An
agent has apparent authority "where the principal, by words or
conduct, leads people with whom the alleged agent deals to
believe that the principal has granted the agent the authority he
purports to exercise." Residential Reroofers, 976 F. Supp. at
345.  Kaminsky held himself out as Vice President of Sales of MWB
Business Systems, a private label entity.  That entity, created
by the agreement between MWB and DLL, was listed in the lease as
the owner of the equipment Miramax was leasing.  DLL's agreements
with MWB provided that the customer would be presented with the
private label name and would never deal with or hear about DLL

29

except in unusual circumstances.  DLL's own actions, therefore, were intended to, and did, create the impression that the only entity Miramax was dealing with was MWB Business Systems, represented by its Vice President of Sales, Kaminsky.

Moreover, the 2004 Rental Agreement provided that it was effective as soon as MWB Business Systems signed the delivery and acceptance form for the leased equipment.  FOF ¶ 43.  By delivering the copiers to Miramax after Miramax signed the new agreements, DLL manifested by its actions that Kaminsky had appropriately exercised his authority to enter into a contract on its behalf.

Both MWB and DLL are thus bound by the versions of the 2004 Rental Agreement that Miramax actually signed.  That Agreement provided for monthly rent of $17,650.  FOF ¶ 42.  Miramax's 2005 Rental Agreement and 2005 Payment Agreement reflect the same total monthly payment, $11,830.14 under the Rental Agreement plus $5,819.86 under the Payment Agreement.  FOF ¶¶ 58-59.  Miramax paid more than this amount each month.  FOF ¶ 60.  DLL has not produced competent evidence to show otherwise.  Miramax has fulfilled its obligations under the parties' valid agreements and owes nothing further to DLL or to MWB.

As a result of the fact that these 2004 and 2005 agreements are binding on DLL and MWB, Miramax is no longer liable under its prior 2000 lease with DLL because the 2004 and

2005 Rental Agreements state that "[t]his lease supercedes original contract #24368657." FOF ¶ 39, 55. Moreover, as the Court ruled during trial, DLL cannot bring any claim based on Miramax's alleged failure to make payments as due under the 2000 lease. Plaintiff's Exhibit 8 therefore was excluded to the extent that it attempted to assert damages based on Miramax's alleged failure to make full payment under the 2000 lease. Trial Tr. 4-8, Dec. 10, 2007.

2. <u>Miramax's Fraud Claim Against MWB</u>

Miramax also brings a claim of fraud against MWB, arguing that MWB, through Kaminsky, perpetrated a fraud on Miramax and is therefore liable to Miramax for the damages arising from that fraud. Miramax asserts that it has shown all of the elements necessary to a fraud claim under Pennsylvania law: "(1) a misrepresentation, or a fraudulent utterance or non-disclosure, (2) an intention by the maker that the recipient will thereby be induced to act, (3) justifiable reliance by the recipient upon the misrepresentation, and (4) damage to the recipient as a proximate result." <u>C & K Petroleum Prods., Inc. v. Equibank</u>, 839 F.2d 188, 191 (3d Cir. 1988) (citing <u>Thomas v. Seaman</u>, 304 A.2d 134, 137 (Pa. 1973)).

Miramax contends that it reasonably relied on Kaminsky's misrepresentations that he had the authority to enter

into a lease containing the terms that he proposed to Miramax. In addition, it argues, Kaminsky's misrepresentations "appear to have caused DLL mistakenly to believe it had an enforceable agreement against Miramax.  This mistaken belief led to this lawsuit," and to Miramax's attorneys' fees in defending the suit. Miramax Br. in Supp. of Mot. for Summ. J. 29.

In response, MWB argues that an action for fraud is not an established exception to the rule that a litigant is responsible for its own attorneys' fees absent an agreement.  See Hoffman v. Smith, 682 A.2d 1282, 1292 (Pa. Super. Ct. 1996) (citing Pittsburgh Live, Inc. v. Servo, 615 A.2d 438, 441-42 (Pa. Super. Ct. 1992)).  MWB further argues that Miramax has not cited a case in which the court awarded attorneys' fees to a fraud plaintiff.

Although Miramax does not cite to it, there is in fact a body of case law establishing that a fraud plaintiff may recover the costs of defending or bringing a suit against a third party as a result of the fraud defendant's deception.  In contrast, the cases that MWB cites establish that the fraud plaintiff cannot recover the attorneys' fees associated with prosecuting the fraud action itself against the fraud defendant.

Under Pennsylvania law, the victim of a fraud is entitled to recover actual loss proximately caused by its reliance on the defendant's misrepresentations.  The victim is

32

not, on the other hand, entitled to recover benefit of the bargain damages.  Tunis Bros. Co. v. Ford Motor Co., 952 F.2d 715, 735 (3d Cir. 1991).  Pennsylvania recognizes the Restatement (Second) of Torts § 914, which provides that "[o]ne who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover reasonable compensation for the loss of time, attorney fees and other expenditures thereby suffered or incurred in the earlier action."  See also Vadim v. Lower Bucks Hosp., Inc., 465 A.2d 1231, 1235 (Pa. 1983).

The Court of Appeals for the Third Circuit has ruled that the Pennsylvania courts would recognize a claim for fraud damages in the amount of attorneys' fees expended on a suit with a third party occasioned by the fraudulent party's actions.  In making its ruling, the court of appeals rejected the same argument that MWB makes here.  That is, it found that the general rule regarding attorneys' fees did not apply in the case before it, in which a plaintiff was seeking to recover money spent investigating a claim by a third party.  Seaboard Sur. Co. v. Permacrete Const. Corp., 221 F.2d 366, 371-72 (3d Cir. 1955) (citing Restatement (First) of Torts § 914) (internal citations omitted).  Although this case is not recent, it has been cited with approval more recently by courts in this district, and this Court has found no indication that the its ruling is not still

33

good law.  See, e.g., Lexington Ins. Co. v. Forrest, 263 F. Supp.
2d 986, 1004 (E.D. Pa. 2003); Guadagnini v. LaGioia, No. 92-1323,
1996 WL 431830, at *5 (E.D. Pa. July 31, 1996).

    Moreover, the comments to the Restatement state that
the recovery of attorneys' fees for litigation with a third party
is appropriate in a circumstance similar to the present
situation:  "A, fraudulently purporting to be an agent for B,
contracts with C, who, upon B's failure to perform and in the
belief that B is liable, brings unsuccessfully a suit against B.
C can recover damages from A for the cost of the proceeding."
Restatement (Second) of Torts § 914 cmt. b, illus. 2.  In this
illustration, a party fraudulently led to enter into a contract
can recover the costs of bringing an unsuccessful suit against
the purported other party to the contract.  The present case is
simply a mirror image of that scenario: here, Miramax was sued in
contract and successfully defended the suit, after Kaminsky
fraudulently led Miramax to sign a contract the contents of which
Kaminsky later misrepresented to DLL.

    Having found that, under Pennsylvania law, fraud
damages are available to reimburse a party for its costs in
defending third-party litigation proximately caused by a
defendant's fraud, the Court must now examine first whether
Kaminsky committed fraud and, if so, whether MWB is liable for
Kaminsky's fraud.  The Court finds that Kaminsky's behavior in

34

connection with the Miramax contract fulfills the first two requirements for a fraud claim: "a misrepresentation" and "an intention by the maker that the recipient will thereby be induced to act." Kaminsky misrepresented to Conine that the reduction in the contract price could be made, and he represented that MWB could make the changes because it wanted to keep Miramax's business. FOF ¶ 19. In addition, as the Court has just explained, Miramax has also proven the fourth fraud requirement: damage as a proximate result of the misrepresentation, in the form of its attorneys' fees in defending against DLL's claims.

As to the third requirement, justifiable reliance upon the misrepresentation, MWB argues that Miramax did not justifiably rely on Kaminsky's representations. In particular, it argues that Miramax was unreasonable in accepting Kaminsky's proposals because they were too good to be true, so to speak. According to MWB, Miramax therefore had constructive notice that Kaminsky had exceeded his authority as an agent for MWB. However, as the Court has already found in the above discussion of Kaminsky's authority to act on behalf of MWB, Miramax reasonably relied on Kaminsky's representations and did not have notice that Kaminsky had exceeded his authority to act. Kaminsky therefore committed fraud against Miramax.

Having found that Kaminsky committed fraud, the Court must now determine whether MWB is liable for Kaminsky's fraud.

The Court has little difficulty finding that it is.  Under
Pennsylvania law, a principal is liable to third parties for "the
frauds, deceits, concealments, misrepresentations, torts,
negligent acts and other malfeasances of his agent," regardless
of whether they were authorized or justified, and regardless of
whether the principal knew, so long as the fraudulent act
occurred within the scope of the agent's employment.  Travelers
Cas. & Sur. Co. v. Castegnaro, 772 A.2d 456, 460 (Pa. 2001)
(citing Aiello v. Ed Saxe Real Estate, Inc., 499 A.2d 282, 285
(Pa. 1985)) (internal citations omitted).  This rule is premised
upon the notion that it is more reasonable for the principal, who
has placed the agent in a position of trust, to suffer than an
innocent stranger.  Id.  As the Court has already explained,
Miramax was indeed the "innocent" party in this transaction, in
that it did not act unreasonably in relying on Kaminsky's
representations and it had no part in any wrongdoing.

        MWB is therefore liable to Miramax for Kaminsky's fraud
against Miramax, and, accordingly, the attorneys' fees that
Miramax expended in defending against DLL's claims.  However, MWB
is not liable for the attorneys' fees that Miramax expended in
litigating against MWB itself.  The Court will determine the
amount of reasonable attorneys' fees at a later date, following
an opportunity for Miramax and MWB to be heard on this issue.

C.   <u>DLL Versus MWB</u>

DLL claims that MWB's behavior constitutes a breach of the 2000 Program Agreement and the warranties contained therein. It further claims that MWB is liable for having perpetuated a fraud against it.  The Court finds that MWB did in fact breach the terms of the 2000 Program Agreement.  The fraud claim, however, fails.

1.   <u>Breach of Contract and Breach of Implied Warranty</u>

DLL argues that MWB breached warranties contained in the September 5, 2000, Program Agreement and that MWB is therefore liable to DLL under the terms of that agreement.  MWB argues in response that the 2000 Program Agreement had been terminated prior to the events at issue in this suit, and that, in any case, DLL should have known the lease documents were not originals and thus should not have entered into the transaction.

As explained above, DLL and Imagine Technologies were the primary parties to the 2000 Program Agreement, and that various subsidiaries of Imagine Technologies, referred to as "dealers," separately agreed to the terms of the Program Agreement.  FOF ¶¶ 82, 85.  Moreover, the contract specifically noted that Imagine Technology and the dealers are all "separate entities" and that they have not acted, nor shall they be deemed to have acted or act as agents for one another.  FOF ¶ 84. Appended to the Program Agreement is an acknowledgment signed by

37

MWB in which MWB agreed to be bound by the terms and conditions of the Program Agreement.  FOF ¶ 86.

As for the September 7, 2004, letter from Global Imaging Systems, the Court finds that this letter only terminated the Program Agreement as between DLL and Global Imaging Systems, as successor to Imagine Technology.  It did not, however, terminate the Program Agreement as between DLL and the various dealers who separately agreed to the Program Agreement.  FOF ¶¶ 93-95.  The termination letter stated only that <u>Global</u> would not renew the amended Program Agreement.  FOF ¶ 94.  The termination letter is silent as to the dealers, each of whom separately and on its own behalf acknowledged its acceptance of the Program Agreement.  Having signed a contract in which it separately and explicitly agreed that Imagine Technology did not act as its agent, MWB cannot now rely on the termination of that contract by Imagine Technology's successor as having been an act taken on MWB's behalf.

DLL also presented further evidence that the termination letter did not apply to MWB and that MWB continued to conduct business as usual with DLL even after the termination letter.  FOF ¶¶ 96-97.  Although MWB subjected that evidence to cross-examination, it provided no testimony or other evidence of its own beyond the termination letter itself that MWB was included in the termination.

The Court thus concludes that the termination letter did not affect MWB's obligations under the Program Agreement. The Court cannot imagine that DLL would continue to buy equipment contracts from MWB, or that MWB would continue to negotiate such contracts on behalf of DLL, if the parties were not each protected by the continuing contractual assurances embodied in the 2000 Program Agreement.

As explained above, the 2000 Program Agreement contains warranties by Imagine Technology and by the dealers that any equipment contract delivered to DLL under the terms of the Program Agreement is an original copy that has been duly authorized and executed, and which is not the product of any fraud on the part of Imagine Technology or the dealers.  FOF ¶¶ 87-88, 91.  The Program Agreement further provides that if Imagine Technology or any dealer breaches any of the warranties and as a result a lease with an end user "becomes in default," then Imagine Technology the breaching dealer must make the payments already due on the lease, future unpaid payments, and the estimated fair market value of the equipment.  FOF ¶ 92.

MWB, through Kaminsky, breached the warranties described above.  After Miramax stopped making payments, its contract became in default--according to DLL's version of the contract.  The provision requiring a dealer to cure breaches by end users that are the result of the dealer's own acts thus

39

applies to the present situation.  MWB is therefore liable to DLL for the amount of damages laid out in Section Six of the Program Agreement.  Whether DLL should have known that the lease documents Kaminsky gave them were phony is irrelevant to the question of whether MWB breached the express warranties laid out in the Program Agreement.  The Court will give both DLL and MWB an opportunity to be heard on the amount of these damages.

MWB is not, however, liable for attorneys' fees as described in Section Seven of the Program Agreement.  Under that provision, MWB agrees to indemnify DLL for any losses, including attorneys' fees, that DLL incurs in connection with or related to MWB's breach of representations or warranties.  FOF ¶ 92.  This provision addresses indemnification in the event that DLL is forced to make payments as a result of MWB's breach.  Although it mentions attorneys' fees, Section Seven's indemnification provision does not mean that DLL can recover attorneys' fees in an action against MWB to recover the damages due to DLL under Section Six of the Program Agreement.  This provision would apply, for example, if as a result of MWB's fraud, DLL were itself sued by an end user for not providing what that end user had expected based on MWB's representations.  Here, having chosen throughout most of the litigation to persist in its argument that Miramax had agreed to the terms in DLL's version of the

agreements, DLL cannot now force MWB to incur the costs of prosecuting the breach of contract claim against Miramax.

    2.  Fraud

    DLL's second amended complaint also includes a fraud claim against MWB.  DLL does not mention the fraud claim in its post-trial memorandum, and does not mention fraud damages in Exhibit 9, in which it lays out all of the damages it believes it is owed by MWB.  In addition, DLL fails to respond to the argument in MWB's post-trial memorandum that the fraud claim is barred by the gist of the action doctrine if governed by Pennsylvania law or the economic loss doctrine if governed by Ohio law.[3]

    The Court has already awarded DLL contract damages based on the 2000 Program Agreement.  In fact, one of the contractual provisions on which DLL will recover specifically contemplates that DLL will receive damages if "Imagine Technology or Dealer and its agents and employees . . . committed any fraudulent act or participated in any fraudulent act or activity in connection with the execution, delivery or assignment" of an equipment contract governed by the PA.  The contract therefore

---

    [3]    MWB states that because the 2000 Program Agreement includes an Ohio choice of law clause, the question of whether the fraud claim is barred may be governed by Ohio law.  Neither party discusses which state's law should apply, but the Court's conclusion is the same regardless of which law governs.

41

contemplated the possibility of fraud and provided contractual damages for just such an event.  In any case, any damages based on a fraud claim would likely be lower than the contract damages the Court has awarded, since a fraud plaintiff can recover only actual loss proximately caused by its reliance on the defendant's misrepresentations, not benefit of the bargain damages.  <u>Tunis Bros.</u>, 952 F.2d at 735.

        The Court finds that DLL has waived its fraud claim against MWB by failing to mention that claim and by failing to respond to MWB's arguments regarding the gist of the action doctrine and the economic loss rule.  Even if the claim were not waived, it appears that DLL's contract recovery may bar its fraud claim.  Because DLL did not brief this question and because the fraud claim was waived, however, the Court does not reach the question of whether the fraud claim is barred by the gist of the action or economic loss doctrines.

        An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DE LAGE LANDEN FINANCIAL      :      CIVIL ACTION
SERVICES, INC.                :
                             :
        v.                   :
                             :
MIRAMAX FILM CORP., et al.    :      NO. 06-2319


ORDER

AND NOW, this 23rd day of September, 2008, following a
bench trial held before the Court on December 10 and 11, 2007,
and upon consideration of the parties' summary judgment briefs
and post-trial memoranda and other submissions, IT IS HEREBY
ORDERED that, for the reasons discussed in a Memorandum and Order
of this date:

1.    On DLL's contract claims against Miramax, judgment
is entered for Miramax and against DLL.

2.    On Miramax's claims against DLL and MWB for a
declaratory judgment, judgment is entered for Miramax and against
DLL and MWB.

3.    On Miramax's fraud claim against MWB, judgment is
entered for Miramax and against MWB.

4.    On DLL's breach of contract and breach of warranty
claims against MWB, judgment is entered for MWB and against DLL
with respect to attorneys' fees.  In all other respects, judgment
is entered on these claims for DLL and against MWB.

5.   On DLL's fraud claim against MWB, judgment is entered for MWB and against DLL.

IT IS FURTHER ORDERED THAT:

6.   Miramax may submit to the Court a petition to recover from MWB attorneys' fees that Miramax expended in defending against DLL's claims.  This petition must be filed on or before October 7, 2008.  Any opposition must be filed on or before October 24, 2008, and any reply thereto must be filed on or before November 3, 2008.

6.   DLL may submit to the Court any request for damages from MWB in accordance with Section Six of the September 7, 2005 Master Contracting Financing Program Agreement and MWB's Acknowledgment thereof.  This petition must be filed on or before October 10, 2008.  Any opposition must be filed on or before October 27, 2008, and any reply thereto must be filed on or before November 6, 2008.

BY THE COURT:


/s/ Mary A. McLaughlin
MARY A. McLAUGHLIN, J.

2